# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHRISTEL EGGERS, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 16 C 9554 |
| SATURN FREIGHT SYSTEMS, INC., | ) Judge Joan H. Lefkow |
| Defendant. | ) |

## OPINION AND ORDER

Christel Eggers has sued Saturn Freight Systems, Inc., for discrimination based on both her age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* (count I), and her sex, in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.* (count II), and for creating a hostile work environment in violation of Title VII (count V). (Two other counts have been dismissed. (Dkt. 21.)) Saturn now moves for summary judgment on all three counts. (Dkt. 34.) For the reasons below, Saturn's motion is granted.[1]

---

[1] The court has jurisdiction under 28 U.S.C. § 1331. Venue is appropriate under 28 U.S.C. § 1391(b).

1

## BACKGROUND[2]

### I. Eggers's Termination from Saturn

Saturn is a logistics company based in Carol Stream, Illinois, co-owned by Phil Bouchez, Jim Bouchez,[3] and Bill Stoltz. (Dkt. 36 ¶ 2.) In 1995, Saturn hired Christel Eggers as a dispatch assistant. (*Id.* ¶ 5.) By the time of the events in this suit, her title was office manager. (*Id.* ¶ 6.) For the most part, her office manager position did not entail supervising any other employees and, although her duties fluctuated, her primary responsibility was local cartage billing—sending invoices and managing receivables for short-haul trucking. (*Id.* ¶¶ 6–7, 34.) Typically, Andy Dukats, Saturn's dispatcher, would collect documentation from drivers about where they had driven and what services they had performed, then deliver that documentation to Eggers, who would prepare an invoice that she would send to the client. (*Id.* ¶¶ 35–36.)

One of Saturn's largest clients, Pactiv, set out guidelines for how Saturn should format its invoices. (*Id.* ¶ 37–38.) Among other things, Pactiv required Saturn to itemize certain charges including lumper (unloading) fees, fuel surcharges, and the like. (*Id.* ¶ 40.) Jim became concerned about billing practices for the Pactiv account, and on March 23, 2016, he convened a meeting with Eggers and sales representative Nick Sowa to discuss billing practices on that account. (*Id.* ¶ 42.) After a quick review of Pactiv bills that Eggers had prepared, Jim identified significant errors and violations of Pactiv's billing guidelines, including that Eggers failed to bill

---

[2] Unless otherwise noted, the facts set out below are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to the non-moving party. The court will address many but not all factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). The court has considered the parties' objections to the statements of facts and includes in its opinion only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. Any facts that are not controverted as required by Local Rule 56.1 are deemed admitted.

[3] The court refers to the brothers Bouchez by their given names.

for lumper fees, consolidated multi-stop loads into a single bill without itemizing the stops, and billed at the wrong rate. (*Id.* ¶ 44–45.)[4] Jim instructed Eggers and Sowa to go through every Pactiv invoice to identify billing errors. (*Id.* ¶ 46.) Eggers resisted, insisting that she had e-mails that would prove that "she had everything covered." (*Id.* ¶ 47.) Jim then shouted and swore at Eggers, some variant of "I don't fucking want to hear any of your fucking excuses." (*Id.* ¶ 48; dkt. 41 ¶ 51.)

Jim suggested they all take a break and that Sowa and Eggers continue the audit, which he would help with after returning from lunch. (Dkt. 36 ¶ 49.) When Jim returned, Sowa was continuing the audit by himself, which upset Jim. (*Id.* ¶¶ 50–51.) Sowa retrieved Eggers, who returned to the conference room with a stack of paperwork related to the Pactiv account. (*Id.* ¶ 51–52.) She slammed the stack of papers on the table and said, "Here, I've been doing everything you told me to do since you fucking told me to do it." (*Id.* ¶ 52.) Jim sent Eggers home for the day. (*Id.* ¶ 53.)

Shortly after the March 23 incident, Jim prepared paperwork to notify ADP TotalSource, the outside company Saturn used as its human resources department, of his intent to fire Eggers. (*Id.* ¶ 55.) But before he sent that paperwork, Eggers contacted ADP to claim that Jim created a hostile work environment by shouting and swearing at her. (*Id.* ¶ 56.) Though Eggers privately told her friend Colleen Hernandez, who handled brokerage and freight billing at Saturn, that she would tell ADP about "everything" wrong with Saturn (dkt. 42 ¶¶ 3–4), there is no evidence in the record that Eggers mentioned age or sex discrimination to ADP. (Dkt. 36 ¶ 57.) ADP began investigating Eggers's claim and advised Jim neither to contact Eggers nor terminate her until the

---

[4] Although Eggers claims that Dukats was responsible because he failed to provide documentation to her, the record does not support that claim. Eggers testified that Dukats sometimes failed to provide documentation to her (*see* dkt. 41 ¶ 36), but errors like failing to itemize charges and billing them at the wrong rate entail knowing what services were performed.

3

complaint had been fully investigated. (*Id.* ¶¶ 58–59.) After completing its investigation on April 6, 2016, ADP concluded that there was not a hostile work environment at Saturn. (*Id.* ¶¶ 60–61.)

Five days later, on April 11, 2016, Saturn terminated Eggers. (*Id.* ¶ 62.) Jim prepared a Record of Termination that listed the following reasons: (1) failure to meet performance expectations; (2) insubordination; and (3) gross misconduct, with Jim's annotation, "Billing errors that cost the company thousands; did not follow company protocol for customer billing issues; complete[ly] disregarded my directives." (Dkt. 36-3 at 45.) Saturn ultimately failed to collect about $5,800 from Pactiv because of Eggers's billing errors. Though Eggers disputes this number, claiming that Saturn offered a variety of conflicting estimates, Saturn in fact continued to find more errors as its investigation continued. (*Compare* dkt. 42 ¶¶ 19–31 (Eggers claiming conflicting estimates), *with* dkt. 42-10 (Jim found $1,817.26 in lost revenue at the March 23, 2016 audit); dkt. 42-11 at 6 ("The errors discovered through April 2016 had amounted to approximately $4,000 in losses to date."); dkt. 36-2 ¶ 9 ($5,822 in total losses by time of summary judgment motion).) Eggers does not have evidence that these calculations are wrong or false.

Eggers was 51 years old when Saturn terminated her. To replace Eggers, Saturn hired Kathleen Sikorski, a 41-year-old woman. (*Id.* ¶ 68.)[5] The parties dispute whether billing practices improved under Sikorski, though there is nothing in the record to suggest that Sikorski was insubordinate or failed to follow directives.

---

[5] Saturn's statement of facts, filed in August 2018, says Sikorski "is 43 years old." (Dkt. 41 ¶ 68.) Viewing the evidence in the light most favorable to Eggers, the court assumes that Sikorski was 41 years old and at least 10 years younger than Eggers in 2016.

## II. Eggers's Claims of Discrimination

Eggers filed a charge with the Equal Employment Opportunity Commission in April 2016. Eggers now sues Saturn for age and sex discrimination and for creating a hostile work environment. Eggers argues that Jim's shouting and swearing at her on March 23, 2016 was one in a succession of unpleasant incidents at Saturn.

Many of her complaints focus on Brian O'Shea, whom Saturn hired in 2011 to manage the brokerage division. (*Id.* ¶ 8.) O'Shea often ridiculed her or told her he was going to get her fired. (*Id.* ¶ 19.) O'Shea once called Eggers a "nut job" to a client. (*Id.* ¶ 20.) O'Shea was also abusive toward male employees. (*Id.* ¶ 19.) One run-in with O'Shea stands out in Eggers's memory. In July 2013, she entered a stall in the women's bathroom at Saturn and underneath the divider saw a man's pants around his ankles in the stall next to her. (*Id.* ¶ 12.) Eggers realized that the man was O'Shea and left without using the bathroom, chastising O'Shea on her way out. (*Id.* ¶ 13.) After O'Shea exited the bathroom, Eggers called him an asshole. (*Id.* ¶ 18.) O'Shea emailed her the next day, threatening, "[C]all me an asshole one more time and I'm going to tell Phil that you've been smoking weed in the bathroom, we smell it all the time!" (*Id.* ¶ 18.) The men's bathroom was under construction around the time of the incident, and Saturn advised its employees that men would temporarily use the women's bathroom and that employees should lock the door after entry. (*Id.* ¶ 16–17.) The parties disagree, however, whether the men's bathroom was out of order on that day. (Dkt. 41 ¶ 16.) O'Shea died in August 2014. (Dkt. 36 ¶ 22.)

Within the last few years of her employment at Saturn, Eggers overheard several uses of inappropriate gender-related language, none spoken directly to her. In 2010, Eggers heard Bill Stoltz call a female driver a cunt. (*Id.* ¶ 28.) In July 2013, Eggers overheard Jim call another

5

woman the same word. (*Id.* ¶ 25.) Eggers sent Jim an e-mail asking him not to use that word, and she does not claim to have heard the word in the office again. (*Id.* ¶¶ 26–27.) In May 2015, she overheard another employee mention blow jobs to Stoltz. (*Id.* ¶ 29.) Eggers emailed Stoltz, telling him that she did not want to hear that language, and Stoltz responded that people in glass houses should not throw stones. (Dkt. 42 ¶¶ 12–13.) At some other point in 2015, Eggers overheard a Saturn employee saying that if Eggers cut her hair any shorter she would look like a dyke. (Dkt. 36 ¶ 30.)[6] She also notes that younger male employees sometimes drank beer at work on Fridays, against company policy. (Dkt. 42 ¶ 39.)

The record also contains statements from Eggers's former colleagues about Saturn's general sentiment toward women. One former colleague texted Eggers that he believes that Phil does not like women. (*Id.* ¶ 40.) And Hernandez, whom Eggers disclosed as witness to the general treatment of women at Saturn, testified, "I feel like I get treated just like everybody else at Saturn. I don't feel like I'm treated better or worse," "I don't have facts that either Ms. Eggers or myself were discriminated against," and, "Do I think that the place is hostile? No, I don't." (Dkt. 36-4 at 23:14–16, 24:13–14, 41:18–19.)

Finally, Eggers also overheard age-related comments during her time with Saturn. Phil and Jim occasionally called older employees (but not Eggers) "dinosaurs" in jest. (Dkt. 36 ¶ 31.) Phil also said that he liked the "young bucks" in the brokerage division. (*Id.* ¶ 32.) And when Saturn provided Eggers with a new chair and an ergonomic keyboard, Phil commented about Eggers getting old. (*Id.* ¶ 33.)

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any

---

[6] Eggers notes another instance of foul language that she did not disclose to Saturn in discovery. The court does not consider it here. (Dkt. 51.)

6

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). In response, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Day* v. *N. Ind. Pub. Serv. Co.*, 987 F. Supp. 1105, 1109 (N.D. Ind. 1997); *see also Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

## ANALYSIS

I. **Age and Sex Discrimination**

    A. **General Principles of Federal Anti-Discrimination Statutes**

Eggers claims that she was discriminated against because of both her age, in violation of the ADEA, and her sex, in violation of Title VII. Similar principles apply to both statutes, which prohibit Saturn from taking adverse employment actions against Eggers based on her membership in a protected class. 29 U.S.C. § 623(a)(1); 42 U.S.C. § 2000e-2(a)(1).

Eggers seeks to prove both age and sex discrimination "under the *McDonnell Douglas* burden-shifting approach by producing evidence that a similarly situated person not in the protected class was treated more favorably." *Id.* (citing *Carson* v. *Lake Cty.*, 865 F.3d 526, 532 (7th Cir. 2017) and *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973)). Under the *McDonnell Douglas* framework, Eggers must first make her *prima facie* case: (1) she is a member of a protected class; (2) she is performing her job satisfactorily; (3) she suffered an adverse employment action;[7] and (4) similarly-situated colleagues outside the protected class were treated more favorably. *Farrell* v. *Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005). If she makes this showing, the burden shifts to Saturn to "articulate a legitimate, nondiscriminatory reason for the challenged action." *Wrolstad* v. *Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018). If Saturn can do so, the burden shifts back to Eggers to show that the stated reason was pretextual. *Id.* In its review, the court considers the totality of the evidence together. *Ortiz* v. *Werner Enters., Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016).

### B.     *Prima Facie* Case

There is insufficient evidence from which a reasonable jury could find that Saturn discriminated against Eggers because of her age or sex under the *McDonnell Douglas* framework. The first and third elements of the *prima facie* case are not disputed, as Eggers was fired (adverse action) when she was older than 40 (protected classes). But no reasonable jury could find that Eggers met Saturn's legitimate expectations. It is undisputed that eighty to eighty-five percent of Eggers's job involved local cartage billing; yet she sent out improper bills, failing to bill for services performed and disregarding client billing preferences. *See Jones* v. *J.B. Hunt*

---

[7] The court agrees with Saturn that by failing to respond to Saturn's argument that only termination was an adverse action, Eggers has forfeited claims based on any other actions. *See Bonte* v. *U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

*Transp., Inc.*, No. 15-cv-07450, 2017 WL 3130645, at *5 (N.D. Ill. July 24, 2017) (granting summary judgment where plaintiff committed errors in main responsibility of her position). She claims that she received a satisfactory performance review (dkt. 40 at 8) but notes elsewhere in her brief that the review took place in the 1990's, roughly twenty years before she was terminated. (*Id.* at 5; dkt. 42 ¶ 38); *see Karazanos* v. *Navistar Intern. Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991) ("[T]he issue is whether the employee was performing well at the time of [her] termination.")

Eggers argues that there is a fact dispute over precisely how much money Saturn lost because of her errors (and which documents would show losses), which is neither material nor truly disputed. Eggers made the mistakes regardless of how much Saturn lost. Indeed, even if Saturn had eventually collected all the money it was rightly owed, it would not mean that Eggers prepared the bills correctly in the first instance. Moreover, how much revenue Saturn lost is even less relevant to Eggers's insubordination, as there is no dispute that Eggers resisted Jim's directive to audit her billing mistakes. Although Eggers then went to work on the Pactiv matter alone at her desk, when Jim returned to the conference room, Eggers was not there, suggesting to him that she was defying his directive. *Gates* v. *Caterpillar, Inc.*, 513 F.3d 680 (7th Cir. 2008) ("The proper inquiry mandates looking at [plaintiff's] job performance through the eyes of her supervisors . . . ."). And when she did return, she slammed her paperwork on the desk and swore at him. Even though Jim acted unprofessionally, the question is not whether Jim deserved insubordination but whether Eggers can show that she performed her duties to her employer's satisfaction. She did not. In any event, there is no genuine dispute about Saturn's losses; Saturn lost at least $5,800 from the Pactiv account because of Eggers's billing mistakes. (Dkt. 36-2 ¶ 9.)

Nor can Eggers show that Saturn tolerated similar errors from younger or male employees. Eggers claims that Saturn tolerated similar billing errors from Kathleen Sikorski. Sikorski is also a woman and therefore cannot be used to prove sex discrimination. *Jordan* v. *City of Gary, Ind.*, 396 F.3d 825, 833 (7th Cir. 2005) (rejecting claim where proposed comparator was member of same protected class). But she can be considered for age discrimination, as the court must assume that Sikorski was at least 10 years younger than Eggers. *See Hartley* v. *Wisc. Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997) (establishing presumption that age difference of ten years is substantial). Nonetheless, even if Eggers could show that Sikorski committed billing errors, she cannot show that Sikorski was insubordinate, as Eggers was, or defied directives, as Eggers did. Eggers was terminated both for the errors and her response to them. When asked to audit her bills to find all her errors, Eggers tried to justify her errors rather than continuing the audit as directed. Eggers does not claim that Sikorski acted similarly.

The remaining proposed comparators are not similarly situated. "Although comparators do not have to be identical in every conceivable way, they cannot be 'similarly situated' unless they are directly comparable in all material aspects." *Simpson* v. *Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). Eggers mentions that O'Shea and unspecified other younger male employees in the billing department drank beer, but drinking beer at work and failing to perform one's primary job responsibility correctly are not comparable. *South* v. *Ill. Envt'l Prot. Agency*, 495 F.3d 747, 753 (7th Cir. 2007) ("[T]he similarly situated requirement normally entails a showing that the two employees . . . engaged in similar conduct . . . ." (citation and emphasis omitted)).

Eggers claims that Saturn did not punish Andy Dukats for failing to provide her with documentation needed to prepare the bills. At the outset, Eggers does not provide Dukats's age,

preventing his use as a comparator under the ADEA. *Barricks* v. *Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007) (holding employees whose ages are not disclosed in record are not proper ADEA comparators). Second, there is nothing in the record to suggest that Saturn was aware of Eggers's concerns with Dukats's performance. *Short* v. *Ultra Foods*, No. 05 C 7026, 2008 WL 4390152, at *6 (N.D. Ill. Sept. 24, 2008) (holding employer must be aware of comparators' problems to treat them more favorably). Third, there is no evidence that Dukats became insubordinate or failed to follow directives when confronted about deficiencies in performance, as Eggers did.

Finally, Saturn argues that another employee, Dan Wilkinson, was not similarly situated to Eggers. (Dkt. 35 at 8–9.) In her response, Eggers does not mention Wilkinson, instead proposing Sikorski, O'Shea, and Dukats as her only comparators. (Dkt. 40 at 9–11.) Eggers has forfeited any claim that Wilkinson was similarly situated to her. *Bonte*, 624 F.3d at 466.

### C. Nondiscriminatory Reason for Termination

Even if Eggers could make out her *prima facie* case, Saturn would satisfy its burden to show legitimate, nondiscriminatory reasons for terminating her. Jim documented those reasons in a record of termination: failure to meet performance expectations, insubordination, and gross misconduct. (Dkt. 36-3 at 45.). All these reasons are supported by evidence in the record. It is undisputed that Eggers committed errors in her billing, which was her primary job responsibility. When confronted about those errors, she became defensive, disobeyed Jim's directive to audit the Pactiv bills, and swore at Jim. Although Jim swore and shouted first, escalating the situation, neither the ADEA nor Title VII prohibits that sort of conduct if unmoored to disparate treatment. *See, e.g.*, *Jones*, 2017 WL 3130645, at *5 (holding termination not actionable where plaintiff shows that employer overreacted to her role in errors).

11

### D. Pretext

Finally, no reasonable jury could find on this record that Saturn's stated nondiscriminatory reason for terminating Eggers was pretext for discrimination. *See St. Mary's Honor Ctr.* v. *Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742 (1993)( "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.") As explained above, there is no dispute that the stated reasons for termination were supported by evidence. Eggers offers two responses. First, she paints a picture of Jim and Phil struggling to keep their stories straight, disagreeing about how much money she cost Saturn, which documents would prove Saturn's losses, and even who decided to fire her. While "sufficiently inconsistent" rationales for termination may prevent summary judgment, "explanations must actually be shifting and inconsistent to permit an inference of mendacity." *Bagwe* v. *Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 881 (7th Cir. 2016) (citations omitted). The record does not show any inconsistencies in the reasoning for Eggers's termination; all sources of evidence confirm Eggers was fired for billing errors and insubordination. *Strelchenko* v. *Wisc. Dep't of Revenue*, No. 17-cv-770-jdp, 2018 WL 4554514, at *7 (W.D. Wis. Sept. 21, 2018) ("Shifting explanations about an employer's *reasons* for firing an employee may support an inference of discrimination. But a plaintiff cannot prove a discrimination claim simply by pointing to any inconsistency in the record." (citation omitted)). Regardless, there is no true dispute about how much Saturn lost; Saturn's estimate of its total losses on the Pactiv account simply grew as its investigation continued, ending at around $5,800. Nor was there any true confusion about who fired Eggers. Jim decided to fire her after their March 23 incident. He discussed the decision with his co-owners, Phil and Stoltz, who agreed implicitly. (Dkt. 36-3 at 15:20–16:9; dkt. 36-5 at 54:14–55:9.)

Second, Eggers argues that the termination decision came suspiciously close to Eggers's complaint to ADP, suggesting that Saturn fired her for reporting Jim's behavior rather than for billing errors and insubordination. But there is no genuine dispute that Eggers did not report age or sex discrimination to ADP; indeed, Eggers declined the court's invitation to replead her retaliation claim as retaliation under Title VII and the ADEA. (Dkt. 21.) Thus, even if Eggers could prove that the given reasons for termination were pretext and Jim really fired her for telling ADP about his shouting and swearing, she would not be able to sustain her burden of proving age or sex discrimination. *See, e.g.*, *Visser* v. *Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 667 (7th Cir. 1991) ("[T]he age discrimination law does not protect an older employee from being fired without good cause. It protects him from being fired because of his age.").

## IV. Hostile Work Environment

### A. Timeliness of Claim

Saturn first argues that Eggers's hostile work environment claims are time barred. Charges of discrimination must be filed within 300 days of the harassing conduct. 42 U.S.C. § 2000e-5(e)(1). Saturn argues that most incidents underpinning Eggers's hostile work environment claim involved Brian O'Shea, who died in 2014, more than 300 days before Eggers filed her EEOC charge in April 2016. But "[b]ecause a 'hostile work environment' is a single unlawful practice under Title VII, a discrimination charge based on a hostile work environment encompasses all the events during that hostile environment so long as the charge is filed within the charging period (here, within 300 days of 'the last act said to constitute the discriminatory working condition')." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009) (quoting *Bright* v. *Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 768 (7th Cir. 2007)). Eggers claims that the hostile work environment persisted until she was terminated, permitting review of the entire

timeline of the allegedly hostile environment. *Id.* ("[T]he district court properly considered . . . actions outside the 300-day charging period.").

**B.    Merits of Claim**

"To survive summary judgment on her hostile work environment claim, [Eggers] need[s] to show the following: (1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her gender; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability." *Id.* "To rise to the level of a hostile work environment, conduct must be sufficiently severe or pervasive to alter the conditions of employment such that it creates an abusive working environment." *Id.* (citing *Ezell* v. *Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005)). Factors guiding this analysis include "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Id.* (citing *Rogers* v. *City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003)). "Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Id.* at 840–41 (citing *Adusumilli* v. *City of Chicago*, 164 F.3d 353, 361–62 (7th Cir. 1998)).

First, most of the offensive conduct Eggers highlights was not based on her sex. "Title VII . . . is not a 'general civility code' designed to purge the workplace of all boorish or even all harassing conduct. *Berry* v. *Delta Airlines, Inc.*, 260 F.3d 803, 808 (7th Cir. 2001) (citation omitted). Eggers predominantly cites boorish behavior rather than sex-based harassment. *See, e.g.*, dkt. 42-7 (complaining that Phil was passive aggressive with Eggers); dkt. 36-1 at 103:3–6 ("Q. Did he take your parking spot because you are a woman? A. . . . I don't believe that's the case. I think it was just harassment."); *id.* at 116:9–15 ("Q. Do you think that . . . he was opening

14

the blinds because of your age? A. No. Q. Or because of your gender? A. I think he was being passive aggressive and . . . it was just part of a hostile work environment . . . ."); *id.* at 131:11–20 ("Q. — that foul language was — A. Inappropriate and creating a hostile work environment. Q. . . . [Y]ou were not complaining about mistreatment because of your gender? A. No."). There is no genuine dispute that the principal offender, Brian O'Shea, bullied men and women alike. *Id.* at 103:9–17 (claiming O'Shea created "hostile work environment" by bullying male employee); *Berry*, 260 F.3d at 808 ("Inappropriate conduct that is inflicted regardless of sex is outside the statute's ambit . . . ." (citation omitted)). And although the March 23 incident might have genuinely made Eggers fear for her safety (dkt. 40 at 14), Eggers does not claim that Jim shouted and swore at her because she was a woman.

Second, the gender-related incidents were not severe or pervasive enough to constitute a hostile work environment. Over many years of work, Eggers cites only four uses of derogatory language and one instance of O'Shea's using a stall in the women's bathroom. Occasional gender-related derogatory remarks are insufficient to prove a hostile work environment. *See, e.g.*, *Wyninger* v. *New Venture Gear, Inc.*, 361 F.3d 965, 977 (7th Cir. 2004) ("The occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable. The workplace that is actionable is the one that is hellish.") (citation omitted); *Patt* v. *Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (affirming grant of summary judgment where plaintiff showed eight derogatory remarks). Though the words are themselves severely derogatory, none was spoken directly to Eggers, and only one referred to Eggers, slightly mitigating their severity. *Patt*, 280 F.3d at 754 ("[T]he impact of . . . 'second-hand' harassment is . . . not as great as harassment directed toward [the plaintiff] herself."). The words were humiliating and offensive but not physically threatening.

The added fact of O'Shea's once using a stall in the women's bathroom is not enough to constitute a hostile work environment. Taking the evidence in the light most favorable to Eggers, the court must assume that O'Shea chose to use the women's restroom when he could have used the men's room, rather than because the men's room was closed. Nonetheless, while Eggers highlights that O'Shea's pants were around his ankles in the women's room, she neglects to provide the crucial context that he was in a stall. She did not see his genitals or undergarments, nor he hers. Their exchange of words afterward was not sex-based; she called him an asshole, and he threatened to tell the owners that she smoked marijuana. Eggers does not claim that there was ever a second incident, let alone so pervasive a culture of men using the women's bathroom that the workplace was hostile.

In sum, having viewed the disputed evidence favorably to Eggers, the court cannot conclude that it is sufficient to cause a reasonable jury to find a hostile work environment as that term is applied under Title VII.

## ORDER

The motion of Saturn Freight Systems, Inc. for summary judgment on all claims (dkt. 34) is granted. The case is terminated.

Date: March 28, 2019

_____
U.S. District Judge Joan H. Lefkow